## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| MICHAEL (MOSHE) RASKIND, | : | CIVIL ACTION |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : | No. 16-0629 |
|  | : |  |
| RESOURCES FOR HUMAN DEVELOPMENT, INC., | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

## MEMORANDUM

**ROBERT F. KELLY, Sr. J.**                                        **NOVEMBER 3, 2017**

Plaintiff Michael (Moshe) Raskind ("Raskind") filed suit in this Court against Defendant Resources for Human Development, Inc. ("RHD") under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951 *et seq.* ("PHRA"), alleging that RHD discriminated against him on the basis of his religion and retaliated when he made a complaint of religious discrimination.

Presently before the Court is RHD's Motion for Summary Judgment, which seeks dismissal of all claims in this action. Raskind filed a Response in Opposition, RHD filed a Reply Brief, and Raskind filed a Sur-Reply. For the reasons noted below, RHD's Motion for Summary Judgment is granted.

## I.   BACKGROUND

### A.   Factual History

RHD manages Lower Merion Counseling Services ("LMCS"), which is an outpatient clinic that offers individual, group, and in-home services for people seeking mental health,

alcohol, and drug treatment programs.  (See Def.'s App.[1] C ("Raskind Dep.") at 63-64; Def.'s

App. E ("Padgett Dep.") at 84.)  Raskind worked as the Unit Director of LMCS from November

4, 2013, until his termination on March 25, 2015.  (See Raskind Dep. at 220; see also Compl. ¶

13.)  In his capacity as Unit Director, Raskind had the responsibility of, *inter alia*, supervising

the completion of all clinical and medical documentation required by Medicare and other

insurers; managing the LMCS staff and budget; upholding RHD's values; and ensuring that all

consumers' needs were met.  (See Raskind Dep., Ex. 2 at 1-2.)

During the interview process with RHD, Raskind disclosed to a number of individuals,

including Linda Donovan ("Donovan"), an Assistant Corporate Director, Jesse Padgett

("Padgett"), a Program Coordinator, and Hayes Russock, that he was a devout member of the

Orthodox Jewish faith and would need flexibility to observe the Sabbath and Jewish High

Holidays.[2]  (See Raskind Dep. at 22, 25; Padgett Dep. at 88-89; Def.'s App. D ("Donovan

Dep.") at 52-53.)  Raskind's faith requires him to cease "all work-related affairs throughout the

duration of the Sabbath and Jewish Holidays."  (Pl.'s App.[3] P3.)  Jewish holy days commence at

the sunset of the previous day and extend through nightfall of the holy day itself, during which

"activities such as cooking and bathing are either forbidden outright or seriously curtailed."  (Id.)

Donovan and Padgett assured Raskind that accommodating his request for religious observance

would not be a problem.  (Raskind Dep. at 30-31.)

---

[1] RHD's appendix is located on the Court's docket at Doc. No. 31.

[2] LMCS is located in Bryn Mawr, Pennsylvania.  (Def.'s Mem. Support Mot. Summ. J. at 2.)  Donovan and Padgett worked at RHD's corporate office, known as the "Central Office," in Philadelphia, Pennsylvania.  (Id.)  LMCS was one of twelve programs that reported to Donovan as manager of "Hub B."  (Id.)

[3] Raskind's appendix is located on the Court's docket at Doc. Nos. 33-2 and 34.  Doc. No. 33-2 is bates-numbered from P1 to P105.  Doc. No. 34, which was originally filed under seal and subsequently unsealed based on this Court's October 30, 2017 Order granting the "Unopposed Motion to Unseal Certain Exhibits," is bates-numbered from PC1 to PC16.

Raskind had "routine" supervisory meetings with Donovan and Padgett throughout his tenure with RHD that typically resulted in a "Counseling/Supervision Form" ("Supervision Form") being placed in his file. (See Donovan Dep. at 56 (noting that the supervision forms are "routine").) The first Supervision Form on record is dated January 7, 2014, which provides, among other things, that, although "[o]verall the first two months have gone well for [Raskind]," there was "some early feedback that [he] was perceived as 'unapproachable' from a staff member." (Pl.'s App. P9.)

Raskind had another supervisory meeting on March 27, 2014. (Id. P10.) The Supervision Form notes that Anna Ryan ("Ryan"), the LMCS Office Manager, reported that Raskind made her feel disrespected and belittled. (Id.) In addition, Ryan reported that Raskind had yelled, "what is wrong with you people?," at a staff meeting and at one time called an RHD coordinator "a bitch." (Id.) Raskind admitted to making the, "what is wrong with you people?" statement, but stated that the context was different than how it was reported, as staff members apparently laughed along with him. (Id.) He further noted that using the term "bitch" did not sound like language he would use, but that he may have said "bitchy" or "witchy." (Id.) Lastly, the note indicates that Ryan complained that Raskind wanted all females to wear dresses at work. (Id.) The allegation that Raskind wanted all females to wear dresses at work was unsubstantiated. (Donovan Dep., Ex. 16; Pl.'s App. P15.)

Raskind had a supervisory meeting and his six-month performance evaluation on May 5, 2014. (Pl.'s App. P11, P18.) His six-month performance evaluation form noted that "[t]here has [sic] been several incidents with staff who claimed they were feeling disrespected by your comments or actions (office manager and clinicians). It does appear that you have taken this

seriously and made plans to address it with staff." (Id. P21.)  The Supervision Form from May 5, 2014 did not provide for any performance problems.  (Id. P11.)

On August 7, 2014, another supervisory meeting took place, with the Supervision Form stating that "[Donovan] reviewed with [Raskind] his scheduled hours at the program.  Upon hire, [Raskind] requested accommodation for flexibility on Fridays so he can observe his religious practices.  [He] will continue to work extended hours during the week to assure program needs are met." (Id. P1.)  Additionally, the Supervision Form provides that there was an "us versus them" mentality in the office.  (Id.)  In particular, Padgett noted instances from the outpatient services and the Recovery Support Team where the Central Office/HUB was referred to as "them."  (Id.)  Raskind was apparently open and receptive to the feedback and would examine ways to ensure the staff understood that they were all working towards the same goals.  (Id.)

On September 9, 2014, Raskind emailed Donovan and Padgett and identified three days when he would be leaving early and six days that he would need off between September 24, 2014 and October 17, 2014 to observe Jewish holidays.  (Id. P24.)  Donovan forwarded the email to Barbara Hammer, writing, "So . . . heard of these?"  (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 9; Pl.'s App. PC1.)  According to Raskind, within two or three days of his email, Donovan brought him aside near her desk and asked him whether the requested time off was time that he could not work.  (Raskind Dep. at 33.)  Raskind answered affirmatively, to which Donovan stated, "well, I need a director who's present."  (Id.)  Raskind testified that he took Donovan's "present" comment as a threat.  (Id. at 37.)  However, he was ultimately assured by either Donovan or Padgett that he would be able to take his requested days off.  (Id. at 51.)

Donovan's recollection of the events is slightly different.  She testified that she saw Raskind in the office and asked him whether there was any flexibility with the days he requested

off.  (Donovan Dep. at 105.)  Raskind answered there was no flexibility, and Donovan acknowledged that he would be taking those days off.  (Id.)  Raskind then informed her that he was taking a week off around Christmas because he and his wife had a time share, and if they did not take it, they would lose it.  (Id.)  Donovan testified that "at that point I did say I need a director who is present because there was so much to do at the program.  I did need somebody who was going to be there to work."  (Id.)  Donovan was concerned because there was an added financial crisis because RHD had just received notification that it was losing $200,000 in funding.  (Id. at 104-05.)  In addition, Raskind had already exhausted all but one day and a few hours of paid time off in 2014.  (Id. at 104.)

On September 15, 2014, Raskind complained to Padgett that Donovan's "present" comment amounted to religious discrimination.  (Raskind Dep. at 41; Pl.'s App. P27.)  Raskind testified that "it seemed discriminatory the way she addressed me about my request for times off – time off, saying that I needed a director that was present and why are the holidays so close together."  (Raskind Dep. at 41.)  When Padgett told Donovan about Raskind's complaint, they scheduled a meeting with Human Resources to discuss the issue.  (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 10.)  Raskind, Donovan, and Padgett met with RHD's Human Resources Generalist, Melissa Scholfield ("Scholfield"), on September 16, 2014 to discuss the complaint.  (Id.)  At the meeting, Raskind said Donovan was defensive and that Donovan said she did not intend her comment to mean that he could not take the days off to observe the Jewish holidays.  (Id.; see also Raskind Dep. at 47.)  Donovan summarized the meeting in her notes.  (Pl.'s App. P30-P31.)  Her notes provide that "[Raskind] states that discrimination was a strong word, and that what he felt may not have been exactly that, but more of insensitivity."  (Id. at P31.)  She further wrote that Raskind stated there was a difference between how he felt and thought about

discrimination.  (Id.)  He stated "he knew I did not mean it in that way, that his mind and heart felt two separate ways."  (Id.)

After the meeting with Padgett, Donovan, and Scholfield, Raskind claims that Donovan began treating him differently.  (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 11.)  In particular, he testified that "[s]he was short, critical, more critical of everything I did.  I felt like if I didn't dot an I or cross a T, it was being examined.  I was trying to work under a situation where I felt like there were – like too many eyes were watching me all the time.  It made working there very, very difficult."  (Raskind Dep. at 133.)  In addition, Raskind claims he was "effectively demoted" on October 13, 2014 when Donovan implemented a reorganization of LMCS by promoting his assistant director, Stephanie Sanger ("Sanger"), to the position of co-director, which allegedly stripped him of approximately fifty percent of his responsibilities. (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 12-13.)

On October 30, 2014, Padgett conducted a supervisory meeting with Raskind.  (Pl.'s App. P44-P45.)  The Supervision Form notes that they discussed an accommodation, and that an "accommodation tool" would be forwarded to him to complete in order to coordinate his religious time off for 2015.  (Id.)  Raskind completed the "accommodation tool" and submitted it on November 10, 2014.  (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 14; Pl.'s App. at P46-P47.)

On November 12, 2014, Padgett and Donovan met with Sara Deichman ("Deichman"), a therapist at LMCS.  (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 14.)  Padgett created a summary of the meeting in bullet point format, noting, among other things, that:

- There is an "incredible amount of negativity" coming from director Moshe Raskind[;]

- [Raskind] is very unprofessional and constantly complains about [Padgett] and [Donovan] in front of individual staff as well as groups of staff[;]

- [Raskind] stood by the values sign and stated how [Padgett] and [Donovan] broke each value during his meetings with us[;]

- When there are successes at the program, [Raskind] takes all of the credit, [but] when there are failures, it's always the fault of others who he then blames[;]

- [Raskind's] negativity is affecting the culture of the program, and he constantly criticizes everyone[;]

- Any time after he has supervision with [Donovan] he comes back to the program and complains about her[;]

- [Deichman] has constantly asked for [Raskind] to write procedures for Incident To Billing, which he has not done. She took it upon herself to do so, and is worried that if anything goes wrong with it she will be the person blamed for it[;]

- [Raskind] is setting up an atmosphere of "us versus them", meaning he is separating LMCS from the Central Office[;]

- [Deichman] stated "I'm here when he gets here, and I'm here when he leaves". She doubts that he really has that many meetings that take him away from the office[;] [and]

- [Deichman] has heard [Raskind] say in groups that he is being discriminated against because he [is] an Orthodox Jew. She did not remember how long ago that was.

(Pl.'s App. P48-P49.) On November 19, 2014, another therapist, Michelle Fitzpatrick ("Fitzpatrick"), complained to Padgett that she did not feel comfortable about being on-call. (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 15; Pl.'s App. P50-P51.) Fitzpatrick's complaint was sent in response to an email Raskind sent to Deichman, Fitzpatrick, and Melanie Fox, where Raskind stated that they would begin an on-call rotation beginning on December 1, 2014. (Pl.'s App. P50-P51.)

Raskind was issued his first formal written warning on December 5, 2014 ("First Written Warning"). (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 15; Pl.'s App. P7-P8.) The First Written Warning contained many of the items from the summary of the meeting with Deichman, but also included many of Donovan's own observations, including, among others:

- [Raskind] had in an email to Chester Hospital mentioned that "he had won this one" against the RHD Corporate office. We are on the same team, and need to act accordingly.

- On the day of the Hub meeting, [Raskind] arrived at 9am, not realizing this was the Book Club portion of the day, even though it had been on several emails. He sat at the circle, and was on his cell phone texting or emailing the entire hour during the book club discussion.

- [Raskind] recently informed staff through email that they would have to participate in on call rotation [sic], and sent this while he was supposed to be participating in the hub [sic] meeting. Staff were very upset that this had never been discussed or problem solved with them, and that they were informed this way. This is an unacceptable way to communicate with staff about an important program change.

- [Raskind] has used up all of his [Paid Time Off], and currently owes 5.7 days from September and October. [Raskind] has not made sure that these days were deducted from his pay. This is his responsibility. [Padgett] and [Raskind] discussed this issue on 10/30/14, [Padgett] emailed him an update on 10/31/14 and requested a reply, and [Raskind] did not respond.

- There have been concerns that [Raskind] is not managing the incident to billing or completing the task of assisting the doctors with information to bring to their insurance carriers about adding RHD to their insurance. These are not tasks to delegate to other staff; they would fall under the role of Director.

(Pl.'s App. P7.) Raskind wrote a "Corrective Action Response," providing, in part:

- First, I recognize I have been negative as of late and have inappropriately expressed this to some of the staff at LMCS creating a climate that thwarts productivity and creates discomfort. For this I am very sorry and plan to make amends to the best of my ability.

- I believe I have a nervous habit of checking my phone for messages and then answering things that seem urgent even when the situation calls for NOT doing this. I can only say that I will give it my best effort to leave the room to check on [sic], answer, and send messages to LMCS staff while in a meeting and only when appropriate. True emergency calls will be taken outside the room.

- I have arranged PTO to be taken. I had thought this would be done at my supervisory level, as similar issues were handled at other agencies I have worked for. I apologize that it was not clear that I should make those arrangements (after the fact).

- Incident to billing had been handled solely by my Assistant Director. We (myself and other staff members) oriented her. It was my responsibility to check that case assignments were being done correctly, and I let this drop, trusting that it was. I take ownership of that. I am working to repair this.

- Last, there has [sic] been some report [sic] that I do not work a full 40 hour week. I leave early Fridays for religious reasons. I work extended hours throughout the week to make up for the [2-2.5] hour difference and often work more than the 37.5 hours that I am required (nature of the position). I have been keeping track of these on a calendar since September 4th.

(Id. P52-P53.)

On January 20, 2015, RHD issued its second formal written warning to Raskind ("Second Written Warning"). (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 18 (citing Pl.'s App. P91).) The Second Warning was a result of a recent internal audit of the "Incident to Billing" service that established a high error rate with the process.[4] (Id. at 18 (citing Pl.'s App. P91).) At deposition, RHD's Director of the National Regulatory Systems Team and Chief Compliance Officer, Carol Flinn-Roberts ("Roberts"), explained that Incident to Billing is a Medicare regulation where a provider may bill Medicare at a physician's rate of pay when a non-physician

---

[4] The term "Incident to Billing" is styled a number of ways throughout the documentary evidence and briefing to this Court. For consistency, we will refer to the process as "Incident to Billing."

delivers the service.  (Id. (citing Def.'s App. F ("Roberts Dep.") at 36-37).)  Shortly after

Raskind started working for RHD, he was tasked with implementing a system for Incident to

Billing in order to obtain higher reimbursement rates from Medicare.  (Padgett Dep. at 142-44.)

Donovan testified that Incident to Billing was one of the most important tasks that needed to be

handled at the LMCS program.  (Donovan Dep. at 151.)  However, the internal audit of sample

data showed that twenty percent of services from January 31, 2014 to October 24, 2014 had been

improperly billed.[5]  (Roberts Dep. at 52.)  Roberts testified that "any error rate above five

percent we consider high."  (Id.)  Raskind testified that improper billing was "a very big issue"

because Medicare takes a percentage of billing that does not comply with the regulations and

asks for that percentage back.  (Raskind Dep. at 91.)  After the audit results were generated, but

before Raskind's Second Written Warning, Donovan wrote to Dennis Roberts and Laura

Gordon, stating that she would like to continue with Incident to Billing and "hold [Raskind]

responsible for delivering service correctly."  (Pl.'s App. P102.)

On March 13, 2015, Padgett, Raskind, and Fitzpatrick had a meeting, which culminated

in a Supervision Form that noted several of Fitzpatrick's complaints.  (Raskind Dep. at 334, Ex.

22.)  The Supervision Form states that Fitzpatrick asked Raskind to reassign a client because she

had a therapeutic conflict, but Raskind made her disclose her disability in order for the client to

be reassigned.  (Id.)  The form also indicates that Raskind talked about therapists to members of

the staff, as well as to visitors, and that Raskind "vented" to her about other therapists.  (Id.)

Further, Fitzpatrick complained that after she disclosed her disability to Raskind, he asked her in

a group setting whether "'ADD is something you struggle with.'"  (Id.)  Fitzpatrick was

understandably offended "due to her recent disclosure, and that [Raskind] asked it twice in the

---

[5] The Second Written Warning incorrectly states that the error rate was eleven percent.  (See Pl.'s App. P91.)
Eleven percent was merely the sample size of the total number of claims between January 31, 2014 and October 24,
2014.  (Roberts Dep. at 50.)

meeting." (Id.)  At deposition, Raskind admitted he made the ADD comment in the group

setting and only meant it as a joke.  (Raskind Dep. at 332-33.)  Although he admitted he made

the comment, he claimed that Fitzpatrick never disclosed her disability to him and that he had no

idea she suffered from ADD prior to making the comment.  (Id.)

Raskind was terminated on March 25, 2015.  (Pl.'s Response Opp'n Def.'s Mot. Summ.

J. at 22 (citing Pl.'s App. P103).)  His "Corrective Action Form" provides as follows:

> [Raskind] was issued a written warning on 12/5/14 for issues
> related to communication, staff complaints about his
> professionalism and managing conflict.
>
> He was issued a second written warning on 1/20/15 for failure to
> assure that services were billed and provided according to
> regulations for Medicare Incident To billing.  An internal audit was
> done, with an estimated pay back (extrapolated) of over $8,000.
> [Raskind] was trained on proper procedures before the Incident To
> practice was put in place and as Director was responsible for
> implementing proper procedures.
>
> An annual evaluation was completed and reviewed with [Raskind]
> on 2/11/15 for review period 11/4/13 to 11/4/14, with six areas
> listed as "Need for Improvement".  Those areas include Staff
> relationships, Supervision of staff, response to feedback, ability to
> incorporate RHD philosophy into the program milieu, Quality of
> Work and Attendance.
>
> Since that evaluation, there continues to be multiple staff
> complaints about his supervision style, and failure to support staff
> in a crisis.  [Raskind] also asked a staff person in front of another
> staff if she had ADD after she had recently disclosed to him that
> she has personal mental health issues.  [Raskind] agreed he made
> the comment but stated it was "a joke".
>
> [Raskind] has been afforded supervision by phone and in person
> multiple times each week, with no marked improvement in his
> relationship with staff.  It is therefore the decision of RHD to
> terminate his employment at LMCS.

(Pl.'s App. P103.)

Donovan testified that Raskind's ADD comment was the "final straw." (Donovan Dep. at 178.) She stated that throughout Raskind's employment at LMCS there had been complaints about his supervision style and for "somebody that was a clinician and a director [that] would joke about a staff person disclosing any disability that they had, I just thought that it's not getting better. . . . [i]t is not getting better and I think it was just time to part our ways." (Id.) His termination form indicates that he was terminated for "poor performance" and "unsatisfactory performance." (Donovan Dep. 191, Ex. 40.) The form also indicates that "excessive absenteeism or tardiness" were not reasons for his termination, as the box on the form remained unchecked. (Id.)

Raskind's employment at LMCS also included complaints from staff members who stated that he was not working a full week. As mentioned above, Raskind was hired with the understanding that he would be permitted to leave early on Fridays to accommodate his religious practices, but that he would work additional hours to make up for that lost time. (Raskind Dep. at 68.) However, there were reports from employees that Raskind was leaving work early on days other than Fridays. For example, on May 7, 2014, Raskind wrote an email to Padgett, stating, "I need to leave around 4:45 today, I have an important event to attend in Cherry Hill by 5:30. It seems we can meet with Anna at 3. I need to check with her." (Padgett Dep., Ex. 2.) The next day, Padgett forwarded Raskind's email to Donovan, writing, "[Raskind] was gone by 4 yesterday . . . you'll have to help me on this, because you pointed out this morning that I'm not as unbiased as I used to be . . ." (Id.)

Other individuals also expressed a concern that Raskind was not working a full week. Sanger, who shared an office with him, testified as follows:

> Q:     Based on your observations was he responding to these issues or not?

A:     You said my observations, not.

Q:     Why do you say that?

A:     Because a lot of what was being asked of him was not answered by action and because he was not present very often for a full day at the clinic. And so I don't think he had the opportunity to address a lot of these issues.

Q:     What do you mean he wasn't present at the clinic?

A:     He arrived to work late, he left early. He was absent a lot.

Q:     Now, did you keep track of his comings and goings?

A:     I did not.

Q:     Do you know whether he was leaving to have meetings with other directors or meetings off site?

A:     Sometimes I knew that. Sometimes he would tell me he was going to the doctor or he was going home.

                    *        *        *

Q:     You were just left with the impression that he was leaving early?

A:     It was more of than [sic] an impression. I was still sitting at my desk.

Q:     But again, you don't know if you [sic] were leaving early to attend meetings with other folks?

A:     He usually said where he was going.

Q:     He would tell you I'm done for the day. I'm going home.

A:     Um-um.

Q:     This would be during the middle of the work week?

A:     Yes.

(Sanger Dep. at 37-38.) Padgett testified similarly during his deposition, stating that "[t]here were times when I tried reaching him after 3:00, after 4:00 during the week, not on a Friday, and I wasn't able to get him." (Padgett Dep. at 164.) Deichman, in her November 12, 2014 meeting

with Donovan and Padgett, stated, "I'm here when he gets here, and I'm here when he leaves." (Pl.'s App. P49.) Raskind's absence in the evenings was concerning to Padgett because Raskind would not be able to provide support or input to therapists who were working an evening shift and had clinical concerns about clients. (Padgett Dep. at 163.)

### B.    Procedural History

On or about April 23, 2015, Raskind filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual filed with the Pennsylvania Human Relations Commission. (Compl. ¶¶ 51, 52.) The EEOC issued to Raskind a "right to sue" letter on December 10, 2015, and he subsequently filed suit in this Court on February 8, 2016. (Compl. ¶¶ 53, 54.) RHD filed a Motion for Summary Judgment on August 8, 2017, seeking dismissal of all of Raskind's claims in this action.

## II.    <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could

return a verdict in favor of the non-moving party.'" Compton v. Nat'l League of Prof'l Baseball Clubs, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting Liberty Lobby, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines that there are no genuine disputes of material fact, then summary judgment will be granted. Celotex, 477 U.S. at 322.

## III.    DISCUSSION[6]

Title VII provides, in part, that "[i]t shall be an unlawful employment practice for an employer to . . . (a) fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a).[7]

---

[6] We will analyze Raskind's claims under Title VII and PHRA together, as the standards are the same in the employment discrimination context. See Larochelle v. Wilmac Corp., 210 F. Supp. 3d 658, 677 n.9 (E.D. Pa. 2016) (citing Scheidemantle v. Slippery Rock Univ., 470 F.3d 535, 539 n.5 (3d Cir. 2006)).

[7] The PHRA provides, in part, that

> It shall be an unlawful discriminatory practice . . . (a) For any employer because of the . . . religious creed . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to

The United States Court of Appeals for the Third Circuit ("Third Circuit") has recognized two theories for an employee to establish religious discrimination: (1) disparate treatment and (2) failure to accommodate. See Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 281 (3d Cir. 2001). "An employee may also claim that his employer retaliated against him for opposing an employment practice that he reasonably believed to be unlawful under Title VII." Mathis v. Christian Heating & Air Conditioning, Inc., 158 F. Supp. 3d 317, 329 (E.D. Pa. 2016) (citing 42 U.S.C. § 2000e-3(a)).

In this matter, Raskind is proceeding under (1) a failure to accommodate theory of religious discrimination; (2) a disparate treatment theory of religious discrimination; and (3) a claim of retaliation after he made a complaint of religious discrimination. (See generally Compl.) RHD moves for dismissal of all claims in this action. For the following reasons, RHD's Motion for Summary Judgment is granted.

## A. Religious Discrimination

### 1. *Failure to Accommodate*

"To establish a *prima facie* failure to accommodate claim, 'the employee must show: (1) [he] holds a sincere religious belief that conflicts with a job requirement; (2) [he] informed [his] employer of the conflict; and (3) [he] was disciplined for failing to comply with the conflicting requirement.'" Mathis, 158 F. Supp. 3d at 329 (quoting E.E.O.C. v. GEO Grp., Inc., 616 F.3d 265, 271 (3d Cir. 2010)). "Once all factors are established, the burden shifts to the employer to show either it made a good-faith effort to reasonably accommodate the religious belief, or such

---

compensation, hire, tenure, terms, conditions or privileges of employment or contract . . . (d) For any person, employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act.

43 Pa. Cons. Stat. § 955.

an accommodation would work an undue hardship upon the employer and its business." <u>Webb v. City of Phila.</u>, 562 F.3d 256, 259 (3d Cir. 2009).

RHD contends that Raskind cannot establish a *prima facie* case of a failure to accommodate claim because the third element is lacking. (Def.'s Reply Br. at 8-9.) Raskind argues that all three elements have been met, and in particular, that there is no dispute that he was disciplined and discharged for failing to comply with the conflicting job requirement. (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 30.) As the parties note, there is no dispute that Raskind holds a sincere religious belief and that he informed his employer that he would need to leave early on Fridays and would need the Jewish religious holidays off. (Donovan Dep. at 52-53 (stating that she did not doubt the sincerity of Raskind's religious beliefs and that he disclosed to her during his interview his need to leave early on Fridays and to take off for the Jewish holidays).)

With regard to the third element of a failure to accommodate claim, "[a]n employer's duty to accommodate cannot arise until an actual conflict between a religious belief, observance or practice and a job-related requirement is actually presented." <u>Prise v. Alderwoods Grp., Inc.</u>, 657 F. Supp. 2d 564, 603 (W.D. Pa. 2009) (citing <u>Wilkerson v. New Media Tech. Charter Sch., Inc.</u>, 522 F.3d 315, 319-20 (3d Cir. 2008)). There is no evidence in the record that Raskind was disciplined for leaving early on Fridays or for taking time off for the Jewish holidays. Rather, the evidence shows that Raskind was permitted to take all of the time off that he requested for religious purposes. (<u>See</u> Raskind Dep. at 274-82, Exs. 6 and 13.) As RHD argues, Raskind would have a claim of failure to accommodate if RHD required him to work late on a Friday or during a Jewish holiday and he was disciplined for failing to do so. (<u>See</u> Def.'s Reply Br. at 7-8.) Raskind requested to leave early on Fridays and notified RHD that he would not be able to

work on certain holidays. RHD fully complied with his request for an accommodation, necessitating the conclusion that his failure to accommodate claim fails as a matter of law. Indeed, RHD actually forwarded to Raskind an "accommodation tool" to ensure that he could take off all of the time in 2015 that he needed for religious purposes. (See Pl.'s App. P44-P45.) Accordingly, RHD is entitled to summary judgment on Raskind's failure to accommodate theory of religious discrimination.

## 2. *Disparate Treatment*[8]

Raskind's claim that he was subjected to disparate treatment based on his religion is analyzed under the framework established in the Supreme Court of the United States' decision in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, a plaintiff must establish a *prima facie* case of discrimination. See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999). To do so, a plaintiff must establish that he was: (1) a member of a protected class; (2) qualified to hold his position; (3) he suffered an adverse employment action; and (4) "a similarly situated person outside of the protected class was treated more favorably, or the circumstances of the adverse action give rise to the inference of discrimination." Oakley v. Orthopaedic Assocs.

---

[8] Raskind briefly argues that there are two instances of direct discrimination in this case: (1) Padgett's May 8, 2014 email to Donovan where he wrote, "He was gone by 4 yesterday . . . you'll have to help me on this, because you pointed out this morning that I'm not as unbiased as I used to be . . ."; and (2) Donovan's September 9, 2014 email to Rebecca Hammer where she wrote, "So . . . heard of these?" (See Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 35-37.)

"Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact in issue without any inference or presumption." Weightman v. Bank of New York Mellon Corp., 772 F. Supp. 2d 693, 702 (W.D. Pa. 2011) (citing Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994)). "Direct evidence is also described as overt or explicit evidence that directly reflects a discriminatory bias that is causally related to the adverse employment decision." Id. (citing Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004)). "If the trier of fact must infer discrimination from the employer's remarks or actions, then the evidence is not direct evidence of discrimination." Id. (citing Torre, 42 F.3d at 829). "Only the most blatant remarks, whose intent could be nothing other than to discriminate in reaching an employment decision, are considered sufficient to constitute direct evidence of discrimination." Id. (citing Taylor v. Procter & Gamble Dover Wipes, 184 F. Supp. 2d 402, 413 (D. Del. 2002)).

Both emails would require the trier of fact to infer discrimination. Moreover, neither email contains a "blatant remark" whose only meaning could be discrimination. Accordingly, Raskind's argument concerning direct evidence of discrimination fails.

of Allentown, Ltd., 742 F. Supp. 2d 601, 608 (E.D. Pa. 2010) (citing Jones, 198 F.3d at 411; Parsia v. Allied Tube & Conduit Corp., No. 07-2436, 2009 WL 750191, at *11-12 (E.D. Pa. Mar. 19, 2009)). "If a plaintiff can make out a *prima facie* case, the burden shifts to the defendant to offer a legitimate, non-discriminatory reason for the employment action." Id. (citing Abramson, 260 F.3d at 281-82). "The burden then shifts back to the plaintiff to offer evidence that the employer's proffered reason for the employment action was pretextual, and that the real motivation was discrimination." Id. (citing Abramson, 260 F.3d at 281-82).

        a.     *Prima Facie Case*

RHD concedes the first three elements of Raskind's *prima facie* case and goes straight to arguing that Raskind cannot establish his case of discrimination because there is no evidence that (1) non-Jewish employees who committed the same infractions as Raskind were treated more favorably; and (2) similarly situated employees who did not request a religious accommodation were treated more favorably. (Def.'s Mem. Support Mot. Summ. J. at 30.) In this case, Raskind has failed to establish his *prima facie* case of discrimination because he has failed to produce evidence that a similarly situated employee outside of his religion was treated more favorably than he was. In addition, the circumstances of any adverse employment action do not give rise to the inference of discrimination.

"Employees are similarly situated when they have similar responsibilities and are held to similar standards." Oakley, 742 F. Supp. 2d at 608 (citing Milliron v. Pilot Travel Ctrs., LLC, No. 06-0262, 2009 WL 2579200, at *4-5 (W.D. Pa. Aug. 20, 2009)). "Moreover, employees are similarly situated when their conduct on the job-or misconduct-is similar in nature." Id. at 608-09 (citing Dill v. Runyon, No. 96-3584, 1997 WL 164275, at *4 (E.D. Pa. Apr. 3, 1997) ("To be deemed 'similarly situated,' the individuals with whom a plaintiff seeks to be compared must

'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"")).

Raskind points to three employees, Ryan, Deichman, and Sanger, who he claims are similarly situated and were not disciplined or discharged for similar conduct for which he was disciplined.  (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 24-27.)  Ryan, the office manager, and Deichman, a therapist, can be eliminated from the comparator analysis quickly because they performed different jobs than Raskind, who was the director at LMCS.  Raskind essentially admits that Ryan and Deichman were his subordinates in his briefing.  He explains that prior to his arrival at LMCS, Padgett served as interim director of the program.  (Id. at 24 (citing Padgett Dep. at 51-52).)  Raskind claims, "In that position, Padgett directly supervised Ryan and Deichman, among others."  (Id. (citing Padgett Dep. at 51-52).)  Ryan and Deichman cannot serve as comparators to Raskind because they are not similarly situated, as he was their supervisor.

Raskind has also not put forth any evidence that Sanger was not disciplined or terminated for similar conduct for which he was disciplined.  Like the analysis above, Sanger was not even similarly situated until she was promoted from assistant director to co-director in October 2014.  Padgett testified at his deposition that Sanger had organizational issues and had at one time "told [Raskind] what to do."  (Padgett Dep. at 94-95.)  Even assuming Sanger was similarly situated as of the time of her promotion to co-director in October 2014, her performance issues were entirely different than Raskind's, which will be discussed in much more detail below.

In summary, Raskind can point to no similarly situated individual who was not disciplined for similar conduct that he was disciplined.  Further, there are no circumstances in this case to lead to an inference of discrimination such that Raskind can establish his *prima facie*

case.  Accordingly, RHD is entitled to summary judgment on Raskind's claim of disparate treatment.

> b. *Legitimate, Non-Discrimatory Reasons for the Adverse Employment Action*

Even if we were to conclude that Raskind can establish a *prima facie* case of disparate treatment, summary judgment is still appropriate because RHD had legitimate, non-discriminatory reasons for terminating him.  See <u>Oakley</u>, 742 F. Supp. 2d at 608 (citing <u>Abramson</u>, 260 F.3d at 281-82).

RHD argues that there is an abundance of evidence in the record to show that Raskind's written warnings and termination were inevitable.  (Def.'s Mem. Support Mot. Summ. J. at 28.)  Indeed, the documentary evidence in this case shows that he was having problems with staff members as early as January 7, 2014, which was just two months after he started working at LMCS.  (<u>See</u> Pl.'s App. P9.)  Raskind's March 27, 2014 Supervision Form notes that he yelled, "what is wrong with you people?," at a staff meeting and had at one time called an RHD coordinator a "bitch."  (<u>See id.</u> P10.)  Raskind admitted yelling, "what is wrong with you people?," but stated that the context of the statement was different than how it was reported.  (<u>Id.</u>)  We will draw that inference in his favor, as we must on summary judgment.  However, Raskind admitted that he may have called the RHD coordinator "bitchy" or "witchy."  (<u>Id.</u>)

The May 5, 2014 Supervision Form provides that there continued to be staff who complained that they felt disrespected by his comments and actions.  (<u>Id.</u> P21.)  The Supervision Form dated August 7, 2014 notes that there was an "us vs. them" mentality, where Raskind would refer to the central HUB as "them," and the LMCS site as the "us."  (<u>Id.</u> P1.)

On November 12, 2014, Padgett and Donovan had a meeting with Deichman, who made numerous complaints about Raskind.  (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 14.)

Padgett's summary of the meeting noted, among other things, that Raskind had exhibited an incredible amount of negativity; that he was unprofessional and constantly complained about Padgett and Donovan; that Deichman had constantly asked him to write procedures for Incident to Billing; that he was setting up an "us vs. them" mentality; and that Deichman got to work before Raskind and that Raskind left work earlier than she did. (Pl.'s App. P48-P49.) On November 19, 2014, Fitzpatrick also complained that she did not feel comfortable with a new on-call rotation that Raskind was implementing. (Id. P50-P51.)

Raskind's First Written Warning occurred on December 4, 2014, which contained many of Deichman's complaints, as well as Donovan's own observations. (Id. P7-P8.) Notably, Raskind admitted to some of the behavior, such as being negative and checking his phone during a Book Club meeting. (Id. P52-P53.) Most importantly, however, was the fact that he admitted that he delegated the Incident to Billing issue to his assistant director and wrote, "It was my responsibility to check that case assignments were being done correctly, and I let this drop, trusting that it was. I take ownership of that. I am working to repair this." (Id.)

Raskind's Second Written Warning came on January 20, 2015, which was the result of an internal audit of Incident to Billing that showed a twenty percent error rate in the sample data. (Id. P91; Roberts Dep. at 52.) Padgett testified that Raskind was tasked with implementing a system for Incident to Billing, and Donovan testified that Incident to Billing was one of the most important aspects that needed to be handled at LMCS. (Padgett Dep. at 142-44; Donovan Dep. at 151.) Roberts testified that any error rate above five percent was high. (Roberts Dep. at 52.) As noted above, Raskind admitted that he delegated his duty to his assistant director, took responsibility for concerns that he was not managing Incident to Billing, and admitted he "let [it] drop." (Pl.'s App. P52-P53.)

The tipping point that led to Raskind's termination was a March 13, 2015 meeting between Donovan, Padgett, and Fitzpatrick. The meeting summary provides that Fitzpatrick wanted Raskind to reassign a client due to a therapeutic conflict and that Raskind made Fitzpatrick disclose a medical disability in order to do so. (Raskind Dep. at 334, Ex. 22.) The summary also states that Raskind then disclosed that medical disability while in a group setting. (Id.) Raskind admitted making the comment, but stated he only meant it as a joke and in fact had no idea Fitzpatrick suffered from that particular disability. (Id.)

Raskind's termination came on March 25, 2015. (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 22 (citing Pl.'s App. P103).) His termination form notes performance problems, such as issues related to communication and staff complaints about his professionalism; failure to assure that services were being billed according to Medicare regulations for Incident to Billing; and disclosing Fitzpatrick's disability at a staff meeting. (Pl.'s App. P103.) Donovan testified that Raskind disclosing Fitzpatrick's comment was the "final straw." (Donovan Dep. at 178.)

c.      *Pretext Analysis*

Now that RHD has shown legitimate, non-discriminatory reasons for the adverse employment action, Raskind "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

Under the first prong of the Fuentes analysis, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting Fuentes, 32 F.3d at 764)). Under the second Fuentes prong, the plaintiff "must identify evidence in the summary judgment record that 'allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" Id. (quoting Fuentes, 32 F.3d at 762).

With regard to the first Fuentes prong, Raskind refers to his argument about how Ryan, Deichman, and Sanger are similarly situated individuals that were not disciplined for similar conduct that he was disciplined. (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 41.) As noted above, Ryan and Deichman are not similarly situated because they were Raskind's subordinates. See Oakley, 742 F. Supp. 2d at 608 (citing Milliron, 2009 WL 2579200, at *4-5) (stating that employees must have similar responsibilities and be held to similar standards to be similarly situated). Further, Raskind puts forth no evidence that he was disciplined for conduct that Sanger engaged in and was not disciplined. Accordingly, Raskind cannot show pretext under the first prong of Fuentes.

Raskind claims the second prong of Fuentes is satisfied based on three pieces of evidence: (1) Padgett's May 8, 2014 email where he wrote, "He was gone by 4 yesterday . . . you'll have to help me on this, because you pointed out this morning that I'm not as unbiased as I used to be . . ."; (2) Donovan's September 9, 2014 email where she wrote in response to Raskind's request for religious time off, "So . . . heard of these?"; and (3) Donovan's "present" comment. (See Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 39-45.)

None of the evidence that Raskind points to would allow the factfinder to show that discrimination was more than likely the motivating factor in his termination. See Keller, 130

F.3d at 1108-09 (quoting Fuentes, 32 F.3d at 762).  First, Padgett's May 8, 2014 email contains

no inference of religious discrimination and was sent months before Donovan's September 2014

"present" comment.  Moreover, all three of Raskind's arguments fail to show that discrimination

was the motivating factor in his termination, rather than the abundance of staff complaints about

him, the failure to implement a system for Incident to Billing, and revealing Fitzpatrick's

medical condition in a group setting.  Accordingly, Raskind cannot show pretext under the

second Fuentes prong, and we will grant RHD summary judgment on the disparate treatment

claim.

### B.    Retaliation

Title VII prohibits an employer from "discriminat[ing] against any of his employees . . .

because he has opposed any practice made an unlawful employment practice by this subchapter,

or because he has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3.  "To establish

a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) [he]

engaged in activity protected by Title VII; (2) the employer took an adverse employment action

against [him]; and (3) there was a causal connection between [his] participation in the protected

activity and the adverse employment action.'"  Moore v. City of Phila., 461 F.3d 331, 340-41 (3d

Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).  "If the employee

establishes this *prima facie* case of retaliation, the familiar McDonnell Douglas approach applies

in which 'the burden shifts to the employer to advance a legitimate, non-retaliatory reason' for its

conduct and, if it does so, 'the plaintiff must be able to convince the factfinder both that the

employer's proffered explanation was false, and that retaliation was the real reason for the

adverse employment action.'"  Id. (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500-01

(3d Cir. 1997)).  "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions."  <u>Id.</u> (citing <u>Fuentes</u>, 32 F.3d at 764).

RHD contests the first and third prongs of a *prima facie* case of retaliation, and it concedes the second prong.  (Def.'s Mem. Support Mot. Summ. J. at 22, 29-30.)  Under the first prong, "the employee must hold an objectively reasonable belief, in good faith, that the activity they oppose is unlawful under Title VII."  <u>Moore</u>, 461 F.3d at 341 (citing <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 271 (2001)).  RHD argues that Raskind did not have an objectively reasonable belief that the conduct he was opposing was unlawful because he did not know what Donovan meant by her "present" comment, nor did he ask her what she meant.  (Def.'s Mem. Support Mot. Summ. J. at 29 (citing Raskind Dep. at 37-38).)  RHD further supports its argument by pointing to the fact that Raskind admitted saying to Donovan, "how I felt was the D-word, but not how my head thought."  (<u>Id.</u> (citing Raskind Dep. at 286).)  Thus, RHD claims that Raskind did not have a reasonable belief that he was opposing discrimination because he knew from an intellectual standpoint that Donovan's comment was not discriminatory.  (<u>Id.</u>)

Several facts in the record lead us to the conclusion that RHD's argument about prong one is weak.  First, within just a few days after Donovan's "present" comment, Raskind went to Padgett and made a specific charge of religious discrimination.  (Pl.'s App. P27.)  It remains to be seen how Raskind did not have an objectively reasonable belief that Donovan's comment was discriminatory when the complaint to Padgett was specifically about how the "present" comment constituted discrimination.  Second, Raskind testified that he considered Donovan's comment to be a threat.  (Raskind Dep. at 37.)  Accordingly, Raskind has adduced sufficient evidence to

create a genuine dispute of material fact regarding the first prong of a *prima facie* case of retaliation.

RHD's more substantial argument is that there is no causal connection between Raskind's complaint of religious discrimination and his termination.  (Def.'s Mem. Support Mot. Summ. J. at 22-24.)  The Third Circuit has held that, to establish the requisite causal connection, a plaintiff "must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007) (citing Krouse, 126 F.3d at 503-04; Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)).

"Where the temporal proximity between the protected activity and the adverse action is 'unusually suggestive,' it is sufficient standing alone to create an inference of causality and defeat summary judgment.  LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007) (citing Clark, 532 U.S. at 273-74).  While there is no bright-line rule as to what amount of time is unusually suggestive, "a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."  Id. at 233 (citing Clark, 532 U.S. at 273).  If the temporal proximity is not unusually suggestive, then we must look to whether the proferred evidence, as a whole, supports an inference of discrimination.  Id. at 232 (citing Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280 (3d Cir. 2000)).  "Among the kinds of evidence that a plaintiff can proffer are intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus."  Id. at 232-33 (citing Farrell, 206 F.3d at 279-81).

The parties dispute whether the temporal proximity between the protected activity and the adverse employment action in this matter is unusually suggestive. RHD argues in the negative, noting that three months occurred between Raskind's complaint of discrimination and his First Written Warning; four months occurred between his complaint and the Second Written Warning; and six months passed between his complaint and his termination. (Def.'s Mem. Support Mot. Summ. J. at 22-24.) Raskind claims the temporal proximity is unusually suggestive because there were adverse employment actions almost immediately after he complained to Padgett of religious discrimination. He claims that after he complained of discrimination: (1) Donovan became more critical of him; (2) he was "effectively demoted" when Sanger was promoted from assistant director to co-director; and (3) there was an inconsistent enforcement of RHD policies based on the comparator evidence, as has been discussed above. (Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 45-51.) Thus, there is a fundamental disagreement about what constitutes an adverse employment action in this case.

"[A]n adverse employment action is one which is 'serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.'" Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997)). Raskind attempts to shorten the temporal component by claiming that Donovan became more critical of him and that he was "effectively demoted" as a result of Sanger being promoted to co-director. Both arguments fail based on his deposition testimony. First, after the meeting with Padgett and Scholfield regarding his complaint of discrimination, Raskind testified that Donovan "was short, critical, more critical of everything I did. I felt like if I didn't dot an I or cross a T, it was being examined. I was trying to work under a situation where I felt like there were – like too many eyes were watching me all the time. It made

working there very, very difficult." (Raskind Dep. at 133.) However, he further clarified that Donovan simply changed from being open and friendly to being more business-like. (Id. at 136-137.) Such a change is clearly insufficient to constitute an action that is serious or tangible enough to alter Raskind's compensation, terms, conditions, or privileges of employment. See Cardenas, 269 F.3d at 263 (quoting Robinson, 120 F.3d at 1300).

Raskind's testimony also seriously undermines his claim that he was "effectively demoted" when Sanger became co-director. (See Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 48.) Donovan testified that the decision "rested with" her to make Sanger the director of the mobile services portion of the program and Raskind the director of the outpatient portion, which resulted in him losing some responsibilities. (Donovan Dep. at 117-18.) However, Raskind was not truly opposed to the reorganization as he now claims. When explaining the reorganization of LMCS, Raskind testified that "the decision was made *that the programs were growing too much and would do better to be separated* and to take the assistant director and make her director there and let me watch the clinic." (Raskind Dep. at 64 (emphasis added).) He further stated his opinion about the restructuring of the program, testifying that

> [Sanger] was new to the organization, again, and in that position and it would be better served to allow her to continue as assistant director but with the main responsibility over RST *until it got to a point where she could completely take it over with absolutely no problem and then make the – and then if necessary make the split at that point. So it was just a matter of I was advocating for a slower process.*

Id. at 65-66 (emphasis added). As Raskind's testimony shows, the reorganization of the programs was due to the programs growing too much, not as a basis for a retaliatory motive as he suggests. He also did not truly oppose the reorganization, but was only advocating for a slower process. (See id. at 66.) Therefore, the reorganization does not constitute an adverse

employment action.  Accordingly, the temporal proximity between the complaint of discrimination and the adverse employment action is not unusually suggestive of retaliation.

When the temporal proximity between the protected activity and the adverse employment action is not unusually suggestive, the Court then looks to the evidence as a whole to see whether there is an inference of discrimination.  See LeBoon, 503 F.3d at 232 (citing Farrell, 206 F.3d at 280).  Such evidence includes "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus."  Id. at 232-33 (citing Farrell, 206 F.3d at 279-81).  Here, Raskind claims there was an inconsistent enforcement of RHD's policies based on the differential treatment between Ryan, Deichman, Sanger, and himself.  (See Pl.'s Response Opp'n Def.'s Mot. Summ. J. at 49.)  As discussed above, Raskind's comparator argument is without merit.  Accordingly, Raskind cannot prove that his complaint of discrimination caused his termination, and his *prima facie* case of retaliation necessarily fails.

Moreover, even assuming Raskind could establish a *prima facie* case of retaliation, the burden would then shift to RHD to provide legitimate, non-discriminatory reasons for the adverse employment action.  See Moore, 461 F.3d at 340-41 (quoting Krouse, 126 F.3d at 500-01.).  Raskind would then have the opportunity to present evidence that RHD's reasons are merely pretextual, and that the real motivating factor was retaliatory.  Id.

The arguments concerning RHD's legitimate, non-discriminatory reasons for terminating Raskind, and Raskind's arguments concerning pretext, are identical to those discussed above with respect to the claim of disparate treatment.  Therefore, we find that Raskind has not put forth any evidence to show that RHD's reasons for terminating him were pretextual and that the

real motivating factor was retaliation.  Accordingly, RHD is entitled to summary judgment on Raskind's claim of retaliation.

**IV.**     **<u>CONCLUSION</u>**

For the reasons set forth above, RHD's Motion for Summary is granted.

An appropriate Order follows.